Good morning, Justices. I'm Mary Ann Barnard. I was a trial counsel. I also wrote the appellate brief in this case. The appeal presents three issues, with the first issue being the one that has the most realistic hope of a finding of reversible error. So I'm basically going to address that one. Now, I know the court is going to determine whether there was error, and if there was, whether it was harmless. I'm concerned that the court might also be concerned that there was a prior conviction. And that's why I cited both the abuse of discretion and plain error standards of review in my brief. Frankly, I interpreted the court's then this prior conviction evidence is coming in. That's the way I interpreted it. Now, when I went back and saw the actual transcripts, and basically that August 24, 2001 hearing, which is in the supplemental excerpts of record 49-52 that was submitted by the government, I see that the court said that, well, told me there's a strong chance it's coming in. But the court really didn't, the court said it reserved ruling pending Salazar's actual testimony. And I really took that to mean that it was coming in if he testified and denied, which was definitely going to happen at that point. And, well, let me just ask you this. Even if the district court didn't dot all the I's and cross all the T's on the 609 balancing, can you tell me why the error wasn't harmless given the fact that it kind of came in in a sanitized version, just that he had a conviction for conspiracy, it was a one-liner, it wasn't dwelt on in closing argument, and there was a considerable amount of other evidence of Salazar's involvement? That's true, Your Honor, but actually the government did reiterate that prior conviction in another part of the transcript. The government emphasized the prior conviction later in the trial when questioning defense witness Gordon Carter. Gordon Carter was the auto auction person who testified that somebody, a dealer like Mr. Salazar, would have had to have a clearance. And then the government in cross-examining said, you mean if the person had a prior conviction and that sort of thing. So it wasn't just that one time when questioning Mr. Salazar. It was brought up later. And, Your Honor, basically this court has said that the centrality of credibility of Mr. Salazar is not necessarily the criterion. And that was in the Bensimon case. And certainly this prior conviction was so old that it just had zero probative value. And that was, Your Honor, I submit that that was obvious. So I submit that the court did err. And all the, I searched the case law from this court and other circuits, and it just doesn't, there doesn't seem to be anything similar. And I would submit that maybe that's the case because the law is so had weak evidence. There was an alibi defense. There was modus operandi or identity at issue. But certainly not here. This was a massive investigation. But on the other hand, not harmless because there were certain, certain portions of the evidence that were supportive of what Mr. Salazar was claiming. So unless the court has any further questions, that's pretty much what I wanted to say. Okay. Thank you. Thank you. Excuse me. One of Your Honors, Fernando Del Casio on behalf of the defendant appellant, Mohardin. The central issue is, did the district court err when it denied Mohardin the safety valve adjustment? On the one hand, the government's position is that no error was committed by the district court because Mohardin was in possession of a gun during the commission of the underlying offense. In addition to the arguments that we have presented in our briefs, Mohardin respectfully submits that the district court committed an error because it applied the wrong standard of proof in determining whether Mohardin was eligible for the safety valve. I'm sorry. I am lost. I thought his argument was that he didn't have the minor portion adjustment. Is there a safety valve argument also? Yes. There's two issues, Your Honor. Okay. Sorry. Again, Mohardin respectfully submits that the district court committed an error because it applied the wrong standard of proof in determining whether Mohardin was eligible for the safety valve adjustment. Instead of applying the by a preponderance standard, which is required under the Nelson case, the district court incorrectly applied a higher quantum of proof when it articulated that defense had failed to prove, quote, beyond a preponderance that the gun wasn't used in connection with the underlying conspiracy. Your Honors, the verbatim language of the district court is found at page 138 within Mohardin's excerpts of records, which reads verbatim as follows at line 6, and this is the court speaking. Okay. Thank you. I don't find that the defense has proved beyond a preponderance that this, referring to the gun, wasn't used in connection. Your Honors, Mohardin respectfully submits that the instant case is strikingly similar to the United States v. Nelson of America case found at the United States of America v. Nelson case found at 222 Fed Third 545, a 2000 case, which is a Ninth Circuit Court of Appeals case in which this appellate court remanded the case for resentencing because the district court had also applied the inappropriate quantum of proof standard. In that case, the court articulated that it was, quote, clearly improbable that the weapons were not possessed in connection with the offense. In this regard... Basically, no matter what the standard of proof is here, I mean, he had the gun with him when he went to collect a debt owing on the drug transaction, and it was seen. I mean, the gun was visible. So almost no matter what standard you apply, isn't it met? Your Honor... What more could he have done except pull it out and shoot it? I mean, he had it with him. I believe that the holding in the Nelson case clearly prescribes that there is a bifurcated standard of proof with regard to the application of the sentencing guidelines as it applies to the enhancement and to the safety... Gerber, tell me, I hear you, but no matter what the standard, why isn't it met by someone who takes a gun with him to collect a debt on a drug transaction, and the gun is visible to the owners? Your Honor, that question is answered in the United States v. Lagasse case, which we have cited, and also the United States v. Simmer. Both of those cases essentially stand for the proposition that the mere possession of a gun during the commission of the underlying target offense does not necessarily equate to enhancement, and in this case, by application, a safety valve exclusion scenario, because there has to be a factual nexus between the of the underlying target offense. In this case, it's our position that there is no legal nexus, Your Honor, with regard to the possession of the gun and the underlying commission of the conspiracy, because he did not use the gun in the furtherance of the conspiracy. Except to collect the debt. Well, Your Honor... Or try to collect the debt. That is true. We're not going to deny that he went to the house to collect the debt. However, there was a pre-agreement for him to go to the house. There was a pre-agreement for him to look at this vehicle as collateral for the money that was owed. So the distinction that we're making, Your Honors, is that there's a big difference between someone who uses a gun in the furtherance of that target offense and someone who happens to have a gun in his possession like this gentleman did for self-protection because he was used for auto salvage cases in the California area. And so he used the gun for self-protection. I think that's an argument, but are you saying that the findings are inadequate or that the facts don't support the finding of a connection? We're saying that the application of the standard of quantum of proof is incorrect as it relates to the actual language used by the court in which the court clearly articulated that it was making a ruling based on a beyond a preponderance and likewise with regard to the facts itself that the facts in this case do not support that the gun was used in connection with or in furtherance. Now, looking at it very broadly, very globally, I mean, I guess anything is possible and anyone can say, well, if you have a gun, then obviously the intent is to use the gun. But the distinction in this case is that he had the gun. He admitted to having the gun from day one. He told the police that the reason he had the gun was for self-protection because he worked in a very high crime area in the Los Angeles area. So the gun was in his possession, but it wasn't in the furtherance of that particular target underlying offense. Now, we anticipate that the government will stand up and say, well, he was there as an enforcer. The court made a ruling and stated on the record that he was an enforcer. But there are no facts other than the mere possession of the gun to support that argument. There were phone calls that were made to the person who lived at the house indicating that he was going to be coming over there to collect on the debt. But other than that, there is no indicia. So it's the quantum of proof based on the facts, whether those rise to a preponderance and certainly the finding of the court with regard to this ruling that it went and said you have failed to meet the standard essentially beyond the preponderance goes against the grain of the Nelson case. But he says, I don't see how the defendant can say by preponderance of the evidence he has shown the governor is not part of unrelated to this same course of conduct, the same offense. Yes. Isn't that the correct standard? But on page 16, she enhances that and she says that we have failed to prove beyond the preponderance. And I think that that is the error which is clearly indicated in the. So it's the word beyond in the later conversation. Yes. And it's a question of where does beyond preponderance cut off and where does a clear improbability begin? And our argument before this court is, is that they're one in the same preponderance basically is when you establish something based on the probability of its truth or accuracy, whereas probability and in this case, clear improbability goes further. It's a higher standard. And we believe that the court clearly, clearly by articulating the words made the same mistake that it made in Nelson. Now, Your Honor's comment is as well taken on a global sense with regard to whether it's appropriate for people to have guns. And the answer is no, it is not appropriate to have guns. But on the other hand, for purposes of sentencing, this court has made that distinction previously that there has to be a standard applied, which is different from the enhancement. And looking at the Legassi case, we know that the mere possession of a gun alone is not enough to enhance because there are obviously other reasons why people have guns. And in one of the cases that we cited, the argument was, well, it's actually in the Nelson case, is that he had five guns, a rifle. And, you know, the argument was, is that he had purchased one of the guns for his family member. And if the other guns were all for collection. So I guess it goes back to my original question. You've answered part of it. But I gather from your argument, you're arguing the standard of proof. You say it's at page 138. Right. But now are you also saying that regardless of the standard of proof, that there was the facts don't support the finding of connection? Correct. Okay. So that's a separate argument than standard of proof. It's an attendant argument that wraps in. Well, if the district court didn't say beyond page 138, then would the finding have been secure from your attack? No, Your Honor. Then the attack would have been. Would have been that even though the court would have, let's assume that it would have articulated the correct standard, which it already had, but previously, but then it went on to enhance it. Even if it had applied the correct standard and assuming that the word beyond does not appear on that transcript at all, our position still would hold that under the Legassi case and the Simmer case, that the mere possession of a gun in and of it by itself is not enough to, in this case, deny the safety valve because there is no connection or furtherance of the underlying crime unless one believes that the mere fact of having a gun is enough. Or having the gun while you collect the debt as part of the whole. Correct. Transaction. Correct, Your Honor. And we would agree. We would agree and we wouldn't be arguing here today, Your Honor, that he didn't have the gun for another reason, which takes away and carves out the argument that the gun was there. It couldn't be a dual purpose weapon? Not in the circumstances, Your Honor, because this meeting was prearranged with the person that owned the car. There was assisting Salazar to collect the money. And the record clearly shows that there were many conversations over a course of time with regard to where is the money and the Sotos, who are the owners of the Ford Excursion, the car that was involved when Mr. Mohandeen went there to pick up the car as collateral. All those conversations were preceded that date and time when he went there with the gun. Now, Mr. Mohandeen certainly exercises bad judgment. He's not a prudent person by carrying a gun with him in Los Angeles for whatever reasons. But the distinction we're making, Your Honors, is that this particular instance in time, this moment frozen in time, he didn't have the gun for the furtherance of the conspiracy because they knew he was coming for the pickup. They had the pickup ready for him to take away. They drove up together with Salazar, and they knew that one of the two was going to drive away with the pickup. So it's an extremely fine-lined distinction, but the logic, with the purpose, and the prior holding of this car. Thank you very much. Okay. Mr. Shimori. Good morning, Laura. I guess it's just after noon. I'm Aldi Shimori. I represent Miguel Quetan-Jerez. First of all, let me apologize for the raspiness of my voice and the coughing you heard all morning. That was me sitting back there. You certainly have my sympathy. Thank you. Anyway, we have raised two issues on appeal. We will submit on the first issue on our brief. The second issue deals with the contention that the government violated the plea agreement. Let me just ask you first. Was that raised in the district court? That the government violated the plea agreement? Yeah. No, it was not. Well, doesn't that do you in? Well, that's what the government argues. But it's our position that, first of all, this is plain error, and it can be raised as plain error, and it would be an injustice not to address the issue. Secondly, we believe that when there is a violation of the plea agreement, that that would open everything up. It opens the door to everything. Well, when did he decide that he wanted to withdraw, when he found out that he wasn't going to get substantial assistance? Withdraw? His plea. Okay, that's the first issue. Well, he's also claiming that, well, yeah, he's claiming that if he doesn't get to withdraw, now the government has broken the agreement. Right. And what we're saying is that at sentencing, the government's argument was a violation of the plea agreement, or at least the intent of the plea agreement. And that being the case, it was also basically the plea agreement became an empty gesture. It was a false inducement to get this guy to plead, because what happened, he had a plea agreement just on the verge of trial. Was he told by somebody, either his lawyer or the government lawyer, that if he pleads guilty, he will also get a chance to show substantial assistance in the prosecution? Well, under the plea agreement, which is, I believe, in our brief on page 10, it states that his role would be to testify or to meet with the government at their request. Not when he wants to. It's when the government requests he testify or meet with them or do whatever. And in this case, we have a situation where he entered that plea agreement at sentencing. The government never asked for him to testify or to meet with them or do anything of that sort. And the very last argument that the government makes to the judge, to Judge Gilmore, is that, well, he didn't cooperate. He made his bid and now he has to lie in it. We hear this a lot in these cases where the government has a good enough case without him, so they don't ask him to cooperate. Well, that's fine. And now does he, what does he, is he claiming that because he wasn't asked to cooperate, he didn't get a chance to cooperate, therefore he lost the benefit of his bargain? Well, what happened was he was prejudiced because if you look at the transcripts, the very next page of the transcripts, the court says, well, he didn't cooperate. He doesn't get the benefit of the government's motion for downward departure. But it affected his own motion for downward departure because the court didn't consider it. So he was prejudiced by the fact that the government argued, well, he didn't cooperate. And that's misleading. At the time of this sentencing, the judge has the pre-sentence report, and presumably there's whatever discussion there is in these things about what cooperation he gave. And he's got a lawyer standing there. Now, was the lawyer standing there asleep or did he say anything about the? At the plea agreement or at the sentencing? No, at the sentencing. Well, Your Honor, I was the lawyer there. And I can tell you, it caught us by surprise because there was nothing mentioned in the pre-sentence investigation about this so-called lack of compliance that the government argued at sentencing. And it was the very last thing that they argued before the court rendered a sentence. In fact, it's like the last few sentences. If you look at the transcript, it's the very last thing. Well, normally if a defendant has evidence and was available to give it and the government didn't ask for it, his lawyer would say, well, he was ready, willing, and able to cooperate. His phone didn't ring. They didn't ask him, but he was always willing to cooperate. Now, nothing like that appears in this publicly at sentencing. But I think the impression or the implication that's given by the government is that when you look at the way it's said, the implication is that they wanted him to cooperate, but he never did. And that's not the case. They never asked him for cooperation. He had a chance to respond to that, didn't he? Well, there was. I just wonder why, I mean, if you want to bring another case later, an adequate assistance case, it sounds like he may want to bring one on the plea agreement itself, but that's a different ballgame. We can't. We just have to go on the record we have. Well, I think the problem we have is that if the government is going to offer a plea agreement for the defendant to cooperate and then don't ask for his cooperation, and then at sentencing says, well, he didn't cooperate, so he shouldn't get any benefit, that's like, you know, and then the government says, well, he made his bid. He didn't make that bid. They made that bid for him and then prevented him from saying he cooperated. Well, there may be a little fraud in the inducement there in getting the plea bargain in the first place, but that's a matter for a 2255. Well, I think we've raised that issue as a false inducement to the plea, which kind of ties into the first issue that he didn't have a knowing and voluntary plea in this case. So, you know, I've used up all your time anyway. If the court has any questions. Thank you. Please, the court. Good morning. Tom Miller for the United States. I'd like to handle these in reverse order if I could. As to Miguel Gaetan Perez, there's no fraud in the inducement, and the only way I can say that is that if the court looks at the record, Mr. Miguel Gaetan, if the court looks at the docket, they will see that Mr. Miguel Gaetan Perez filed a motion to suppress his voluntary statement or the statement given right before trial on the 31st of August, and that's in the docket. And I believe that's on page 204 of the docket on Mr. Nishimura's, the appellant's excerpts of record. On September, excuse me, page 204 reflects that on September 5th, right before trial, which just started on September 7th, I always refer to this as our 9-1-1 trial. We were in the middle of trial when 9-11 came around. We started trial on the 7th of September. On August 31st, Miguel Gaetan Perez filed a motion to suppress his statement set for the morning of September 5th. We filed our response on September 4th and brought two agents in from Denver because the defendant was arrested a year later. This case started with wiretaps in February of 2000 on Maui. Yes, wiretaps on Maui, which actually started with wiretaps in your fair state, state wiretaps on Francisco's servant Soto's phone, followed by wiretaps on Maui in February, March, and April of 2000, and a takedown on May 4th, three years ago yesterday, when Salazar was arrested, Mojardin was arrested. The defendant, Mr. Ishimura's client, Miguel Gaetan Perez, was arrested a year later in Denver. He made a statement. He filed a motion to suppress on the eve of trial, the 31st of August. We filed our response on the 4th of September. On the morning of the 5th of September, he withdrew that motion. We had already brought the agents over. Surprise to us, we had the INS agent who had spoken Spanish to Mr. Gaetan Perez and the DEA agent, that is, Mr. Travis Starr from the INS and Tom Bartufiak, I believe, from DEA. They were there, ready to try that motion or to testify for the United States on the motion to suppress. He withdrew that motion and asked for a cooperation plea agreement, which was set that same day. We didn't debrief him. We had no idea what he had, what information he had. His counsel asked for a cooperation plea agreement. We gave it to him. There was no fraud in the inducement. We didn't give him one telling him, you know, you can get substantial assistance later. We don't know what he had. We didn't know. He was gone. He had just been arrested in 2001, and he may have had stuff on people in Denver. We don't know. This is not a situation where we blinked our eye and said, you know, you can get a substantial assistance motion if you cooperate, et cetera. He asked for a cooperation plea agreement. He got that. We went to trial on the 7th and proceeded through it. There was no ‑‑ the government's position is there's no breach of the plea agreement because there's nowhere in the plea agreement that we're required to file a substantial assistance motion. We're required to act in good faith with him, and we did. We submit. We said we would file one. We would consider filing one if he had information or cooperation for us, that sort of thing. We said at the change of ‑‑ excuse me. We said at the time of sentencing he hasn't given us substantial assistance. He could have, we believe, had something or come in. He did not. There was no objection to that. You didn't ask him to, did you? He didn't ‑‑ I don't recall, Your Honor, if there were conversations. I know we never got anything offered to us in writing where we could have gone into it with him about stuff. At this point, you know, after the change of plea, he subsequently moved to withdraw his plea and took a different position on the whole case, that he wasn't involved. He didn't know what he was doing, that he didn't understand the matter, that it was his wife that was really involved with this. He just answered the phone, that he didn't know. And, of course, the evidence was he was friendly with the kingpin. He was a friend with Felipe Ruiz Castro, the subject of the wiretap on Maui. And he was the one that knew that Felipe Ruiz Castro recruited his wife to become a courier and admitted that he had known that she had gone to California on two separate occasions. That's what he said prior to the Las Vegas trip in May of ‑‑ I'm sorry, in March of 2000. Let me move back then to Mohardin. Mr. Mohardin, Mr. Mohardin. Mr. Mohardin was a drug thug. He was an enforcer. There was one purpose for that gun, which is what Judge Gilmore found, and that was to be a strong arm, to collect debts. He was going out to collect a drug debt by physically taking the truck. And, of course, interestingly, in the Raquel Salazar Salazar, we played the tapes of him. And Mr. Cossio says that, well, it was prearranged that Mr. Mohardin was going to the house and meet with him and get the truck. Well, we played the tape of that call on December 30th. And the tape of that call, the tape of that call between Mr. Mohardin and Francisco Servan Soto, the owner of the truck, the husband of Jessica Guzman Soto, is our Exhibit 23 in Raquel Salazar Salazar, Excerpts of Record. And he basically tells on December 30th, I'm, let's see, I'm the guy who's waiting for you over here with this guy, meaning with Raquel Salazar Salazar. And Francisco Servan Soto says, uh-huh, this is page 34 of our Exhibit, Excerpts of Record, I'm sorry. And he says, what is it? Are you going to come over or what? Are we going to do this? Because you're just playing around. And Francisco Servan Soto says, my car's not driving well. I'm having problems with my car. My car's not running well. Yes, well, I've told Don Alberto, Raquel Salazar Salazar, on my way. And he says, all right, all right then. And Jesus Mojardin says, don't be screwing around because otherwise there's going to be a problem. The guy who's packing the gun. And of course, Jessica Guzman Soto, the other owner of the car, the co-owner of this SUV, testified at the trial of Raquel Salazar Salazar that when Raquel, when Mojardin came there to the house to look at another car because there was so much debt on the SUV, the excursion, they wanted another car. They wanted to get another car. So Mojardin came on another day and he had the pistol in his waistband, in his back. And when he leaned over to look at that car, his shirt raised up and she could see it in the back. And she was frightened and went back inside the house. So the pre-sentence report on Mojardin, which finds that he carried the gun for a purpose and which Judge Gilmore, of course, astutely found was for a strong arm to be, to strong arm collect, was to frighten people. Let's say this exactly what it was. That's the reason for the gun. He's an illegal alien. He can't possess a weapon. What about the argument that the court stated the wrong burden? Well, by one, by saying beyond preponderance, I think by any burden it was established, Your Honor. And I think she had earlier stated the correct standard, by a preponderance, beyond a preponderance, by any standard, I submit, this man was carrying a gun for one reason. And it's possessed the gun, not brandished the gun or assaulted by pointing the gun. It's carried the gun in connection with the offense. And his offense was the conspiracy. And his part of the conspiracy was to go out and get that truck and to be armed while doing it. If I might move on to Raquel Salazar. Salazar. Excuse me. I lost my train of thought. Okay. The argument made by Ms. Bernard was that we shouldn't have used the conviction, the previous conviction. First of all, I submit to the court it was not an error, it was not an abuse of discretion. It was a sanitized version of the conviction. That is, weren't you convicted in federal court in Los Angeles in 1985 of conspiracy, period. It could have been conspiracy to whatever, commit fraud. Nothing indicated it was a drug case. Nothing indicated it was a violence case. It was just conspiracy. The defendant was outside the district or outside serving sentence. So we take that off the 10-year count. That he was outside the United States. They had notice of it. They didn't object to the timeframe of it or the dates we gave them on to it. Judge Gilmer, I submit, implicitly weighed it, did a balancing under 403. I just, as a matter of interest, do you have a case on tolling the time that the judge can count on the ancient convictions? No, Judge, I do not. But I wondered about how, because some of these drug conspiracy people spend most of their life in custody, and you wonder how old the conviction is if it was tacked on to the time he served. No. This was, again, in 1985. The conspiracy we charged, I think, was started in 99. 85 takes us to 95. But he was, my understanding is it's right about on the line. And I submit, based upon the plain reading of the rule, I submit Judge Gilmer weighed it. She cited, we cited the cases to her. She said she would look at the cases. Well, it did get before the jury in another way earlier. Anyway, didn't the defense open it up by asking about this car dealership? Or did they ask the witness? I don't remember that, Your Honor. And I'm a little puzzled by the reference made by Ms. Bernard to that. I thought she meant we made it in cross-examination of a defense witness. I don't remember that line of questioning. I didn't see that and didn't go back on that. Well, I don't know which way it cuts anyway. As you say, it was a fairly well sanitized prior. It was well sanitized. We didn't spend a lot of time arguing it. The case against the defendant was strong. I mean, he was picked up on a wiretap. He was picked up on a wiretap telling Francisco Servan Soto, whose phones were wiretapped, get rid of your effing phones. Your phones are screwed up. Get rid of them. They're following me. That was the same day that he had picked up the truck, strong-armed, I submit, repossession of the truck with Mr. Mohardeen's assistance, taken the truck back to Mohardeen's shop and was followed by the police. While he was followed by the police, he's driving counter-surveillance activity. The Ontario Police Department testified about that. He's got Jessica Guzman Soto, who's testifying against him and explaining what's going on and how they come and take his truck. He makes an incriminating statement to the police that, yeah, he says he thought he was being followed and when he said, your phones are screwed, he meant they had a wiretap on him. I mean, it was clear what was going on here. I submit the case against him was strong. If there's any error, and I don't believe it, I submit there is not, it's harmless. And unless the court has some questions for me, I thank the court. All right. Thank you, Mr. Mohardeen. Thank you. Thank you. Just briefly, yes, the cross-examination of Mr. Carter emphasizing the prior conviction was in my statement of facts and I inadvertently didn't include that in my argument, but it's on page 12 of my opening brief at the bottom of the page, and that's in the September 20th transcript. But just in addition, on the harmless error issue, it's on record that the jurors deliberated for seven hours before reaching verdicts. Now, it could be five minutes. In five minutes, they decided this case because there were two co-defendants, but we just don't know that. So it's, and with the evidence supporting the defense side of the case, especially the search of his house and the lack of any hard evidence that he had drugs on him at any time, and so forth, the things I cited in my brief, I don't. And the Bensimon case, going back to the Bensimon case, there was very strong evidence in that case as well, but this court still found reversible error. So I submit the same thing should be done in this case. Okay. Mr. Castillo, everybody's out of time. We just hear if you have something brief to say, we'll be happy to hear it. Thank you for allowing me an additional minute or so to address the court. Just to clarify, Mr. Mojardin was gainfully employed in the L.A. area. There were countless exhibits that were shown to the government to show that he had a legitimate business. He cooperated fully from day one. By the way, he was arrested while his family was asleep. He had minor children, and his wife was in the house. Just to clarify, the characterization of him being a thug I think is an overexpression. He agreed to go with Salazar to collect the money, and that's his only involvement. He never sold the drugs. He never distributed the drugs. He wasn't the kingpin. Doesn't know anybody in Hawaii. Didn't know the couriers that went there, the Salamanca, Lozano people, and the other Espinoza ladies. Didn't know any of those people, Your Honor. So, I mean, when the court looks into this case, please put it in the perspective of what the legal issues are and the holding of Nelson and the fact that there has to be some connection other than just the mere possession of the Nelson. Thank you, Your Honor. I just want to point out that, as we pointed out in our brief, that the government has a duty of good faith and fair dealing in plea bargains. And what we have here is a situation where they offered a cooperation agreement, as stated in our brief, never asked for cooperation, and then argued at sentencing he didn't cooperate. And I think that is not good faith and fair dealing. Thank you. All right. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.  Thank you.
judges: Goodwin, Rymer, T.G. Nelson